**Mark S. DeMarco**
Attorney At Law
3867 East Tremont Avenue
Bronx, New York 10465
718 239 7070
Fax 718-239-2141
MSDLaw@aol.com

January 26, 2017

The Honorable Valerie E. Caproni
United States District Judge
United States District Court
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

**BY ECF , ELECTRONIC & US MAIL**

          Re: *United States v. Kareem Martin*
             S2 14 Cr. 546 (VEC)

Your Honor:

**<u>Introduction</u>**

  Kareem Martin's childhood can only be described as tragic. He was born in Harlem, New York, in 1987, and raised in New York City public housing projects in Harlem, The Bronx, and Staten Island during the height of the city's crack epidemic, a scourge that touched his family closely. His father became addicted to crack and cycled through jail and drug-treatment programs, leaving Kareem without a father or male role model during his formative years.  Kareem's mother, a young single woman with five children from four different fathers, provided an unstable home since she frequently changed apartments, jobs and partners, stayed in shelters and relied on welfare to support her family.

  Kareem struggled as a student, his education was limited, and the schooling that he did receive was of poor quality.  Kareem recalls feeling like he was shuttled from grade to grade with little care.  One of his distinct memories of third grade is a teacher whose main instruction involved pushing a video of cartoons into the VCR. The highest grade Kareem attended was ninth grade.

  Lacking role models at home and structure in school, Kareem turned to peer networks for socialization and education.  In Kareem's words, "the streets raised [him]."  He began to live on his own at age 16, after an eviction forced his family into a shelter. While his mother stayed there, Kareem moved into an apartment in Staten Island with an aunt, who he quickly learned wasn't able to provide for him since she was also addicted to crack.

  Kareem ultimately found something resembling a steady home with his girlfriend Latasia Moore and her mother Regina Moore, and began to stay with them regularly when he was 16.  At

Hon. Valerie E. Caproni
January 26, 2017

the age of 18, Kareem fathered a child with Latasia. But soon after the birth of their son, Latasia died of cancer.

Despite these hardships, family and friends report that Kareem was a caring and thoughtful friend and member of the family. He was generous to siblings, and even coached a young girlfriend to finish school. His goal in life, if given the opportunity, is to attend vocational school and become a licensed plumber.

At the outset, it must be noted that Mr. Martin attempts in no way to minimize the seriousness of his offenses. He understands the significant effect his conduct had on the community where he was raised and acknowledges that this Court must impose a mandatory minimum sentence. Nevertheless, this memorandum is submitted to paint a picture of the young man that this Court will be sentencing. Indeed, this letter is submitted to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by *18 U.S.C. § 3553(a)* in light of *United States v. Booker*, 543 U.S. 220 (2005).

Mr. Martin respectfully requests that this Court consider his difficult childhood, troubled background and numerous good character traits which warrants imposition of the mandatory minimum sentence which is substantially below the advisory guideline range, an appropriate sentence satisfying the objectives embodied in *Booker* and *§ 3553(a).*

**Objections to the Presentence Report ("PSR")**

According to the Presentence Investigation Report ("PSR") prepared by the United States Probation Office, Mr. Martin's adjusted offense level as a career offender pursuant to *USSG §§ 4B1.1(a) and (b)(2)* was calculated to be guideline offense level 37, which, when combined with his criminal history category of VI, provides an applicable sentencing range of 360 months' to life imprisonment on Count One, followed by a mandatory consecutive sentence of at least 84 months' imprisonment on Count Five.

**Mr. Martin is Not a Career Offender**

Mr. Martin's criminal history is described at paragraphs 51-66 of the PSR. Although it assigns 14 criminal history points to Mr. Martin, which would place him in Criminal History Category VI, Probation erroneously maintains that his criminal record consists of two prior felony convictions that result in his classification as a career-offender pursuant to USSG § 4B1.1(b)[1]. Mr. Martin is not a career offender.

---

[1] It is unclear which prior felony convictions were relied upon by United States Probation in concluding that Mr. Martin is a Career Offender.

Hon. Valerie E. Caproni
January 26, 2017

Section 4B1.1 of the U.S. Sentencing Guidelines provides:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. There is no question that Mr. Martin was eighteen or older at the time of the instant offense or that the instant offense is a controlled substance offense. The only issue is whether he has been convicted of the requisite two prior offenses.

At the outset, while Mr. Martin has several prior felony convictions involving controlled substance offenses, only one – his October 24, 2007 conviction for Criminal Possession of a Controlled Substance in the Third Degree [PSR, ¶ 56] – may be considered a "controlled substance offense" under Section 4B1.2(2) which defines "controlled substance offense" as

> an offense under a federal or state law prohibiting the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(2) (emphasis added). Simple possession of drugs is excluded from the category "controlled substance offense."

Mr. Martin's record consists of several additional felony drug convictions. On or about April 20, 2006, he pleaded guilty to Criminal Possession of a Controlled Substance in the Fifth Degree pursuant to New York Penal Law § 220.05, stemming from his possession of crack cocaine on three separate dates in 2005. Indeed, as set forth in the PSR, Mr. Martin simply possessed crack cocaine on or about October 19, 2005, November 12, 2005, and December 23, 2005. He was sentenced to concurrent terms of imprisonment of 6 months' imprisonment, followed by five-years probation (PSR, ¶¶ 53 - 55).

Since there is no evidence before this Court that Mr. Martin did anything more than simply possess drugs on the aforementioned dates, these convictions should excluded from the category "controlled substance offense."

### **Attempted Third Degree Robbery is Not a Crime of Violence**

At the outset it must be noted that Robbery in the Third Degree [New York Penal Law § 160.05] is not considered a violent felony offense under New York Penal Law § 70.02. Accordingly, Mr. Martin's conviction for attempted third degree robbery on October 3, 2011 [PSR, ¶ 57], is simply a Class E non-violent felony in New York. New York Penal Law §§ 70.00

Hon. Valerie E. Caproni
January 26, 2017

& 70.02.

Nor does this conviction, in the wake of *Johnson v. United States*,    U.S.    , 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), qualify not qualify as a "crime of violence" in this Court. Indeed, the New York crime of attempted third-degree robbery no longer qualifies as a crime of violence under the residual clause of the Guidelines' career offender provisions. See *Ward v. United States*, 2016 U.S. Dist. LEXIS 131559, 2016 WL 5372459 (W.D.N.Y. Sept. 26, 2016).

Third-degree robbery is committed by a defendant "forcibly steal[ing] property." New York Penal Law § 160.05.  In *United States v. Jones*,    F.3d   , 2016 U.S. App. LEXIS 13296, 2016 WL 3923838, *5 (2d Cir. July 21, 2016), the Second Circuit examined the issue, and found that "in the wake of *Johnson*[,] a New York robbery conviction involving forcible stealing, absent other aggravating factors, is no longer necessarily a conviction for a 'crime of violence' within the meaning of the Career Offender Guideline." See also *Diaz v. United States*, 2016 U.S. Dist. LEXIS 116619, 2016 WL 4524785, *6 (W.D.N.Y. Aug. 30, 2016) (holding that attempted third-degree robbery is not a violent felony under the ACCA).

Accordingly, where, as here, the record is silent as to the facts underlying Mr. Martin's conviction for attempted third-degree robbery, it should not be used as a predicate to designate him a Career Offender.

**Application of the Section *3553(a)* Factors Calls for the**
**<u>Mandatory Minimum Sentence</u>**

A court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the Guidelines. *18 U.S.C. § 3553(a)*. The Guidelines range is the "starting point and the initial benchmark." *United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38 (2007))*. "A district court is authorized to depart from a Guidelines range if the court finds that 'there exists an aggravating or mitigation circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Juvenile Male Po, 466 Fed. Appx. 14, 15 (2d Cir. 2012) (summary order) (citing 18 U.S.C. § 3553(b))*.

The Court, however, is to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

4

>   offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for —
>
>   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

*United States v. Boykins-Jenkins*, 09 Cr. 861-01, 2011 U.S. Dist LEXIS 107255, at * 2 (S.D.N.Y. Sept. 22, 2011) (quoting 18 U.S.C. § 3553(a)). The defense respectfully submits that a below-Guidelines sentence is appropriate here.

**The Sentencing Factors As Applied to Kareem Martin**

　　18 U.S.C. § 3553(a), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), outline the task facing district courts in considering the guidelines. The court must determine the applicable guidelines range, and further consider applicable policy statements. After thus considering the guidelines, the Court must consider all the other factors set forth in *§ 3553(a)* before determining whether (i) to impose the sentence that would have been imposed under the guidelines, i.e. a sentence within the applicable guideline range or within permissible departure authority, or (ii) to impose a non-guideline sentence.

Hon. Valerie E. Caproni
January 26, 2017

**Personal Characteristics**

### Mr. Martin's Childhood

Kareem Martin was born in Harlem Hospital on November 17, 1987, the second of five children born to Gail Martin, a nurse currently residing in Edwardsville, Pennsylvania. His father James Lesane, who is currently an unemployed electrician living in The Bronx, was addicted to crack and cycling through jail and treatment programs during Kareem's early childhood. In fact, Kareem doesn't remember his father being around at all when he was a little boy. Mr. Lesane didn't appear in his life until Kareem was 9 or 10 years old.

Kareem lived with his mother, half-sister Tiesha, Veronica and half-brother Timothy in a three-bedroom apartment in The Bronx until he was 13 years old. At the time, although Ms. Martin held a job at Century 21, she was also on public assistance and receiving food stamps. Kareem's older sister often cared for her younger siblings and prepared meals. Ms. Martin also enjoyed cooking and while there was usually enough to eat, Kareem recalls at least two periods of his life – when he was about 10 years old – when they ate nothing but pancakes "for like a month."

Mr. Martin has few good memories of his childhood and recalls only one Christmas when he received gifts. Not surprisingly, at age 11, Kareem began staying out late or not coming home for days on end. Attempts to discipline him by hitting him with a leather belt were unsuccessful. When Kareem was 13, the family moved to River Park Towers in The Bronx and he attended P.S. 229 for two years until the family was evicted from their apartment.

The eviction was a turning point in Kareem's life. Ms. Martin moved to a shelter in Brooklyn, where she remained for approximately two years. For various reasons, including getting "jumped" in Brooklyn, Kareem did not like the shelter and after just a few months, he moved in briefly with his grandmother in Harlem and then with his maternal great-aunt Mary George in Staten Island.

Kareem, who was now was 15 or 16 years old soon discovered that his aunt was addicted to crack-cocaine and unable to take care of him. Kareem says he was "forced to get my own money or be starvin' out there." He began to sell drugs.

### Relationship with Latasia Moore & Son Kareem

It was around this time that Kareem started dating Latasia Moore, who he knew from the neighborhood for a few years. He often stayed with her and her mother, Regina Moore. Kareem emphasized that Latasia's place was "clean" and that "Ms. Moore was clean."

Although Kareem felt that he was too young to have a baby when Latasia became pregnant a year or so later, she insisted. "It hurt me to have a girl wanting to have my baby. It felt

6

Hon. Valerie E. Caproni
January 26, 2017

good," he said. Their son was born on January 11, 2006, but since Kareem had been arrested months earlier on assault charges, he missed the birth.

Meanwhile, Ms. Martin left the homeless shelter and moved to 563 Jackson Avenue in The Bronx. Although she wanted Kareem to live with her, he returned to the Stapleton Projects in Staten Island to live with Latasia's family. Eight people lived in that apartment, where he stayed intermittently throughout 2007.

What the family didn't know at the time was that Latasia was sick. She began fainting and falling down and, shortly thereafter, a tumor appeared on her neck. Kareem says he took her to the hospital a few times during this period, but on July 24, 2007, Latasia Moore died. Kareem was incarcerated and was unable to attend the funeral. He was upset that he wasn't able to go. "They took my rib from me when they took her," he said. "That's my heart right there."

Upon his release in 2009, he moved in with his mother, his brother and his sisters in The Bronx. Kareem's son is currently 9 years old. He lives with Regina Moore in Staten Island. Unfortunately, Kareem does not speak with him regularly and Ms. Moore has not told him that his father is incarcerated.

### **Family History of Drug Use**

Kareem's father struggled with drug addiction throughout Kareem's childhood. He was frequently imprisoned for drug related offenses, was in-an-out of drug treatment facilities and was homeless for extended periods. Not surprisingly, Kareem did not develop a relationship with his father until he was approximately 10 years old. Mr. Lesane attributes his absence to his drug problems.

At the age of about 15, shortly after moving in with his maternal aunt Mary George, he learned that she was also addicted to crack cocaine. Prior to moving in, Kareem says his family wasn't aware of the extent of her addiction to crack. In any event, she was ill equipped to provide basic care for Kareem.

When he first moved in, Mary George's apartment seemed fine. She lived there with her two children, Jefford and Sherry. Shortly after arriving, Kareem noticed smoke coming out of his aunt's bedroom. It smelled funny and he immediately knew that it was not marihuana. He saw a crack pipe on a table and eventually Ms. George dropped the pretense altogether. She didn't smoke openly in front of him, but didn't hide the fact that she was getting high. Kareem recalled that the condition of the apartment and the amount of food in the refrigerator was dependent on how high she was.

Since he had grown up seeing crack addicts "on the block," Kareem was concerned with but not frightened by her crack use. She was miserable if she wasn't high, so it was rare that she wasn't high. Kareem often had to fend for himself. Since there was no real food in the house, he needed to "hustle" to raise money.

Hon. Valerie E. Caproni
January 26, 2017

### Educational History

Although most of his school records have not all been obtained, early indications suggest that Kareem was a troubled student. He found math difficult to comprehend but he enjoyed English and history.

On several occasions, Kareem mentioned that he felt pushed along like chattel in school. "I went through elementary school just passing." According to Kareem, he attended elementary school at P.S. 63 in The Bronx. In third grade, Kareem recalls that his teacher, "a big black dude," would just play cartoons on the VCR. When asked if he had good memories of school, Kareem responded that "nothing happened, so there was nothing to remember."

Kareem attended fourth grade at St. Augustine's, a private Catholic school, where his mother obtained scholarships for he and his siblings. However, Kareem never felt welcome at there. He felt singled out and as if his teacher was "waiting for [him] to mess up."

Kareem recalls getting into a couple of fights at St. Augustine's. After the second fight the school expelled him and his siblings. According to St. Augustine's records, Kareem, who was absent for 33 days, received failing marks in every subject and poor evaluations on conduct and behavior.

Kareem returned to P.S. 63 where he remained through fifth grade. After he was expelled from the eighth grade, he transferred to an "S.O.S. school" on Canal Street in Brooklyn. According to Kareem, he left school for good in ninth grade.

### The Mandatory Minimum Sentence

The mandatory minimum sentence is reasonable under *18 U.S.C. § 3553(a)* in view of Mr. Martin's extremely difficult and troubling upbringing and his age. Indeed, general and specific deterrence would be amply served by the mandatory minimum sentence.

As Judge Jack B. Weinstein noted in *United States v. Bannister, 10-CR-0053 (Eastern District of New York)*, there is little evidence that the current regime of mandatory minimum sentences works any significant deterrent effect on potential offenders from backgrounds similar to those of the defendants in this case. General deterrence is especially unlikely in the case of younger people with few educational or professional prospects; limited impulse control due to adolescent development; serious drug and alcohol abuse problems; limited guidance from responsible adults, particularly male ones; and pressure from peer groups in which criminal behavior is accepted and in which the penalty for deviance from the group's norms is embarrassment, ostracism, or physical punishment. In light of these circumstances and given that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques.

Hon. Valerie E. Caproni
January 26, 2017

      As for specific deterrence, Judge Weinstein further opined that nothing suggests that defendants will be rehabilitated or specifically deterred by lengthy incarceration.  Resources for providing them necessary education or job training are limited. The experience of incarceration will remove them from their families and communities and whatever ties they may retain to the non-criminal world. Their peers inside prison are unlikely to serve as positive role models.  Incarceration will give them opportunities to expand their networks of criminal acquaintances, develop antisocial behavior patterns and attitudes, and sharpen whatever criminal skills they have acquired on the streets. Upon release, they are likely to return to their broken families and impoverished communities with underdeveloped skills, dismal job prospects, and a host of the lifelong punishments that are heaped upon ex-convicts in our society, all factors inclining them away from straight life and toward recidivism. *United States v. Bannister*, *supra*.

**The Need to Avoid Unwarranted Sentencing Disparities**

      As stated above, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *United States v. Booker, 125 S. Ct. at 764 (citations omitted)*.  Here, the Career Offender guideline's potential for unwarranted sentencing uniformity comes to fruition.

      Mr. Martin is being treated precisely the same as a drug kingpin, who has the two predicate drug felonies to qualify as a Career Offender. The Career Offender guideline does so without taking into account significant differences in the severity of predicate drug offenses.  As a result, Mr. Martin, who has felony convictions for possessing small quantities of drugs is treated identically to a defendant who heads a drug network and has multiple convictions for trafficking large quantities of drugs.

      Mr. Martin's case is also a prime example of the Career Offender guideline creating unwarranted sentencing disparities among defendants who have been found guilty of similar criminal conduct.  The following chart lists the sentences imposed to Mr. Martin's co-defendants, several of whom are substantially more culpable.

| **Defendant** | **Sentence** |
| --- | --- |
| Nicomedes Fasqueri | 66 months |
| Frederick Allen | 60 months |
| Angel Amerzquito | 60 months |
| Kevin Anthony | 60 months |
| Kelvin Douglas | Time served |
| Derrick Felder | 60 months |
| Anthony Givens | Time served (10 months) |

9

Hon. Valerie E. Caproni
January 26, 2017

|  |  |
|---|---|
| Brian Hall | 60 months |
| Elijah Hubbard | 30 months |
| Terrell Johnson | 60 months |
| Tyrone Margwood | 60 months |
| Shanequa Mascall | 54 months |
| Lamont Obey | 60 months |
| George Stone | Time served |
| Jerome Thomas | 60 months |
| Johna Thomas | Time served (about 7 days) |
| **Total** | 700 months, about 7 days |

Application of the Career Offender guideline gives Mr. Martin the highest offense level and sentencing range. He was not the leader of this conspiracy, but a mere street level peddler. Nevertheless, if he is sentenced at the bottom of the advisory guideline range – 444 months – his sentence would nearly equal the combined sentences given to the first ten defendants listed above. Indeed, operation of the Career Offender guideline here opens the completely absurd possibility that Mr. Martin's sentence will be more than six times greater than the highest sentence (66 months) thus far imposed upon his co-defendants.

Accordingly, notwithstanding the differences in criminal histories between Mr. Martin and his co-defendants, applying the Career Offender guideline to him creates unwarranted sentencing disparities among defendants who have engaged in the same criminal conduct. See *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) ("[D]istrict courts have discretion, in appropriate cases, to align co-defendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system.").

The 204 month mandatory minimum sentence is significantly greater than the sentences given to Mr. Martin's co-defendants, even those far more culpable than him. A 204-month-mandatory-minimum sentence comes closest to satisfying § 3553(a)(6)'s mandate to avoid unwarranted sentencing disparities. Sentencing Mr. Martin to the longer sentence called for by the Career Offender guideline would run counter to § 3553(a)(6) and create a gross sentencing disparity.

**Conclusion**

Kareem Martin, like the majority of his co-defendants, comes from similar deprived backgrounds. They lacked appropriate male models in their homes and they grew up in an environment of personal abuse, illegal drugs, and general poverty. Accordingly, for the reasons set forth above, the defense respectfully requests that this Court impose a sentence which is "sufficient, but not greater than necessary" to comply with the goals set forth in *18 U.S.C. § 3553(a)(2)*.

The defense also respectfully requests that this Court recommend, pursuant to *18 U.S.C. §*

10

Hon. Valerie E. Caproni
January 26, 2017

*3582(a)*, that the United States Bureau of Prisons designate Mr. Martin to be housed in a facility in the Northeast Region of the United States to facilitate family visits. Further, Mr. Martin requests that this Court strongly recommend that he be incarcerated at a BOP facility that offers educational and vocational training. Such a sentence would reflect a just result given all of the facts and circumstances in this case.

.

                Respectfully Submitted,

                *Mark S. DeMarco*

                Mark S. DeMarco
                Attorney for Kareem Martin

cc:    Gina Castellano, Esq.
       Eli Mark, Esq.
       Scott Hartman, Esq.
       Assistant United States Attorneys
       Southern District of New York
       By ECF & Electronic Mail